Case number 23-1045 et al. Huntsman Petrochemical LLC Petitioner versus Environmental Protection Agency. Mr. Lazzaretti for the petitioners, Ms. Chen for the respondent. All right Mr. Lazzaretti. Good morning. Good morning. May it please the court. My name is John Lazzaretti. I'm here today representing Huntsman Petrochemical, American Chemistry Council, and Louisiana Chemical Association. I'd like to request four minutes for rebuttal. Thank you. Your honors, we're here today challenging EPA's ethylene oxide risk value for the miscellaneous organics NESHAP or MON rule. The reason parties put this issue first is that it is dispositive. If the risk value is wrong, the MON rule is wrong. And here the risk value is wrong for several reasons. EPA did not follow the Clean Air Act, it did not follow the National Academy of Sciences recommendations, and it did not follow its own guidance. EPA ignored significant flaws raised in public comments. Rather than base its risk value on sound science, it boiled 17,000 data points into five categories, graphed them, and eyeballed the graph. That is not what the Clean Air Act requires and resulted in an arbitrary and capricious rule. I'd like to start by addressing two statutory violations arising from the MON rule. First, EPA gave an impermissible preference to its iris value or the integrated risk information system value. And second, it ignored the National Academy of Sciences recommendation. On the first issue, the Clean Air Act requires EPA to consider all credible and relevant toxicity information in setting risk values. It cannot just use the latest entry from its iris database. This is what Congress adopted when it incorporated the benzene NESHAP into the Clean Air Act in 7412F2, and it is what EPA told Congress it would do conducting residual risk assessments in its report to Congress in 1999. EPA does not argue otherwise in its briefs. EPA deviated from this required approach in the MON rule. The final risk value relies exclusively on the iris value. EPA put iris on a pedestal and made it the default value in the rule itself. So I agree it would be a problem if there were studies you had pointed to that EPA disregarded entirely, which seems to be the type of argument you're making. But it seems to me that for each of the issues you raised, EPA at least discussed it in some way. And so what we're really doing is fighting over the adequacy of EPA's explanation for why it didn't modify the iris value based on any of these studies. Is that fair? You might still be right that they didn't give adequate explanations, but is that what's going on? Well, Your Honor, first to parse, there's a statutory issue that EPA had a preference for iris and through that did not view other evidence in the right light. Under 7412, that would be a statutory violation separate of whether they even addressed the issues. They've also identified a is used the word studies. And certainly the agency has pointed to topics that are similar to the issues. So if we raise a concern about smoker data, the fact that the iris value predicts a linkage between smoking and lymphoid cancer that simply doesn't exist. They've addressed another topic on smoking, so they may have addressed the study, but they haven't addressed the issues that we were raising. And so that disconnect between the reality checks we've identified and the response that they've made is problematic, even if they had the correct standard under 7412. Well, I think maybe the smoker studies are a useful example, right? Because you pointed to specific, my understanding is you pointed to specific studies, and EPA discusses those studies on a specific page of the response at the reconsideration stage. And it explains, maybe not in the most articulate way, that there were two problems with those studies. They ignored confounding factors, and they used this hemoglobin marker that EPA doesn't view as validated. And so don't you need to persuade us that those explanations are irrational or arbitrary towards a different point you're making? Irrational or non-responsive, Your Honor. So for example, on the first one, our point is that there is ethylene oxide in cigarette smoke. There's a good deal of it. There's so much that if the iris value were correct, there would be a roughly one in 10 risk of smokers developing lymphoid cancer. So there'd be a strong signal of a risk. Lymphoid cancer would be linked. We have decades of research from the CDC that shows no linkage between smoking and lymphoid cancer. Their response is, well, you haven't validated the data, so we don't know exactly what the amount of smoking, what the amount of lymphoid cancer should be when you smoke. But the point is it doesn't matter if it's one or two. If it's supposed to be 10, we're not seeing that. That's the reality check that they were missing with the Well, I don't want to spend all day on these studies, but assume, you know, I'm just a judge. Assume the hemoglobin marker, you know, the wrong baseline to measure whether ethylene oxide is causing cancer. If they're right about that, what value do these studies finding no correlation? Aren't they basically irrelevant? Your Honor, they're not saying that those are, in fact, they use those adducts as well for determining a correlation. So what they're not saying is that it's an unreliable adduct in general. They're only saying that that relationship, while well established at higher concentrations, hasn't been scientifically validated for lower concentrations. Now, that's a little untrue as well, as we point, you know, the data was available for EPA to do that validation. They simply didn't do it. But even if the agency wants to raise, perhaps the number would be slightly different. What we're talking about here is orders of magnitude different. So it's simply addressing the issue with respect to whether the iris value was reasonable to use for setting a risk value for the monitoring. And again, that's getting to a technical issue where first we'd have to, first EPA has to show that it is authorized to use the iris value in the way that it has in this rule. And it hasn't by giving it a preference over other values and over other evidence. Your honor, another statutory issue is the failure to address the National Academy of Sciences recommendations. Section 7607 D3 requires EPA to consider or even proposing a rule that pertinent findings and recommendations of the National Academy of Sciences. Here, there were almost 200 pages of recommendations going to the reliability and accuracy of iris assessments that the NAS published in 2011 and 2014. EPA made no mention of them in the Mon proposal. Both the Supreme Court and this court have noted that 7607 imposes substantive obligations on EPA to consider the NAS's recommendations. Had EPA complied with the statutory requirement, it would have been forced to address many of the same flaws that we're raising today. In fact, EPA has since overhauled the iris program in response to those recommendations. But it has not gone back to address the same flaws in the iris value for ethylene oxide that it's used in the Monroe. This was contrary to law and renders the Monroe arbitrary and capricious and in violation of the statute. Now, your honor, we did address on the factual question of whether the iris value is arbitrary and capricious already the smoker issue. There are a few other examples that I would like to address today. Another issue is the exposure assessments that were used to support the iris value. The iris value is a dose response relationship. So relevant to that study is not only the response, how many people are getting lymphoid cancer, the dose, how much ethylene oxide were exposed to. EPA used the NIOSH study, which did not have exposure data for the vast majority of the time in that study, from 1938 to roughly 76 or 78. So it modeled exposure during that time period. To do this, it assumed there was no change in work practices to reduce ethylene oxide exposure before 1978. That's simply not supported by the record. Petitioners submitted several studies identifying specific work practices that reduced exposure to ethylene oxide over that time. And your honor, again, when you talk about studies that were addressed or not addressed, one study they address is Bogan, where they say that one portion of that study was not adequately documented. It does not address the issue of whether there were work practice involved. And in fact, for that, Bogan cites eight other published studies to identify those work practices, and as well as FDA data demonstrating that medical devices that were subject to sterilization had decreasing levels of ethylene oxide residue on them over time, demonstrating, again, that those work practices were effective in reducing ethylene oxide exposure. The result is that... Could I ask you to address the figures over which there was a lot of back and forth in the briefing? And in particular, I think it would make sense to start with figure 4.3, and maybe what is your position about what EPA did with that figure that it shouldn't have done? Because it seemed to me that whenever you said it did something it shouldn't have done, EPA said we didn't do that. Yes, your honor. And from our perspective, our legal concern is that they did not follow their guidance with respect to selecting the model to use for the risk value. So, once you have the NIOSH data or the study data, the question is what's the dose-response relationship you're finding in that data? Their guidance makes two things clear. First, you're supposed to use biology and statistics to identify a model. EPA did not have a biological reason for its model selection. It asserts that ethylene oxide damages DNA. EPA was recognized in the record that this biologically means that the dose-response curve should be a line, linear, or curving upward. The model they chose is the exact opposite. It starts, it skyrockets, and then plateaus. So this gets to what exactly they mean by linear. Yes, your honor. And it seems, well, their position stated explicitly at the reconsideration stage is that a spline, two lines, is what they call a linear model, including their guidelines. And I'm not sure what basis you had to disagree with that. In the carcinogenic guidelines themselves, there is the footnote, though, that says that a spline is a nonlinear model. Where does it say a spline is nonlinear? It says nonlinear includes, for example, a quadratic model or a threshold model. And in the definition of a low-dose linear model, this case is really fun, acknowledges that it will not be linear at all values. So it seems like a, it might not be a layperson's definition of linear, but they've defined linear in a way that would encompass the spline. Yes, your honor. And I believe in that footnote three that you're citing too, it does reference splines as another example of a nonlinear model. But even if it doesn't, the ultimate issue is that they didn't use this biology as a basis. So biology is off the table. What they've said is they don't have, you know, they're not aware of a mechanistic explanation for the shape of the exposure response curve. So they've abandoned biology. They thought they had statistics to support their model, but there was a problem with their calculation of those statistics, the degrees of freedom. The result is what they thought was a statistically significant model is not statistically significant. In other words, it doesn't predict the data any better than the assumption that there is no relationship between ethylene oxide and lymphoid cancer. Can I ask you about the other carcinogens do have similar spline-like dose response models on J2393, 1950, other places too. Isn't that the basic type of biological disability comparison you're saying they didn't do? If they were talking about the right carcinogen, it might be, but they're not. And the reason is the mechanism by which something causes cancer. And that's why the issue here is that they've identified ethylene oxide as a direct acting mutagen, which means that it directly mutates DNA. That's not something that would, so the biological process would either be linear when it contacts DNA, it damages it, or it would be upward curving. There might be some biological defense mechanisms, DNA repair that gets overwhelmed at some point to allow the curve to move upward. The other type of chemical that they've identified, the plateauing effect, is when your body needs to first metabolize the chemical to make it a carcinogen. So in other words, you need a biological mechanism to make it carcinogenic. That can be overwhelmed, and that's how you would get a plateauing effect. But there's nothing in the record and no allegation that ethylene oxide works that way. Is there anything in the record that says for carcinogens with direct effect on DNA, they cannot have a spline dose response model? Which is the, I think, the point you're making. Yes, in the iris assessment itself, it identifies that for the direct acting mutagen, the expectation would be linear or upward curving. And because of that reason... Does that add down to the dispute over what they mean by linear? Well, not in this context, Your Honor. This is an important point, so if you have a site for that point, you can give us on rebuttal. Yes, Your Honor. That would be very helpful. And then, Your Honor, well, I see I'm running out of time, but if you'd like to address the interpretation with that in mind of the graph, I'm happy to do that as well. I think it would be helpful to at least hear the argument. Okay. So what they did, they did not rely, and the record is clear, they did not rely on biology or statistics to support it. What they did was apply what they call visual fit, which is essentially attempting to eyeball this graph that we're looking at on page 45 of Petitioner's Brief, which you've referred to as figure 4-3. They tried to say, what looks the most like of these straight lines or, you know, most like these purple dots? And that has two problems. First, the purple dots are not the data. These purple dots are a categorical model that EPA ran. So, in other words, they took the 17,000 data points, they identified the 45 or so leukemia mortalities that they wanted to plot, they grouped those into these five dots, and then they ran it through, or they grouped them into five categories, and then they ran it through a model, a categorical model, to say, what's the excess risk? When they sent that to peer review, their science advisory board said, don't do that. Don't use a categorical model to attempt to detect a pattern in the data. When EPA came back, what they did was they used the model, but then used that as their standard for determining what other model, continuous model, would look like the data. And so that's when we say these dots are not the data. These are just an earlier model EPA ran that was rejected that they're now trying to find a line that's most similar to. The other problem is... And so what's wrong with that? What's wrong with that is that this categorical model is just a model. It doesn't actually reflect the pattern in the data. Of course, it's just the beginning. I mean, you act as though everything is the end. There's only one way to do things. And that's not correct, and you know that. There are certainly many ways to identify an appropriate model, but what EPA's guidance says is that you're supposed to use the biology and statistics, and only deviate from a linear model if, you know, a linear model, if biology and statistics support it. And to start with a reason to do so, what the Science Advisory Board specifically said with respect to this is it is dangerous to use a categorical model to try to find the pattern. You need to use the actual data to identify a pattern. And so the starting point needs to be the data itself. If you run data yourself, is that correct? You have to start with the data. Otherwise, what you're finding is not a pattern in the data. And why didn't they start with the data? You don't like where they ended up, but that's a different issue. Your Honor, we've objected to them not starting with the data, but they have not provided an answer as to why they haven't. I think the answer is inertia. They had a model and they wanted to use it, but they were told not by the SAB. Rather than go back to the actual data, they simply tried to find a continuous model that would look like the model they'd already run. The problem is the model they ran doesn't accurately reflect the data. So I have a question about the EPA says in their brief that after the SAB gave this feedback, they actually did go back and run this model using the individual data points. And of course, the categorical dots are based on those individual data points, but they incorporated that feedback from the SAB and addressed it before finalizing in 2016. Is that just false? Well, they may have used the individual data to generate these lines, but to select which line they wanted to use, they went back to their categorical model. And that's because you can generate a whole lot of lines using the individual data they've got. But they went back to the original data. To generate models, but not to select a model. I understand, but you know, you have to be careful what you say to the court, because as Judge Garcia said, we're just judges. So to be careful what you tell us. And you told they didn't go back to the original data. Well, they did. And then they went somewhere you don't like, but that's a different issue. We have raised objections. We have raised concerns with the underlying data with respect to the exposure assessment data. I understand, but the question is, you know, to what extent do those objections stand up? And maybe they do, and maybe they don't. But we have to understand what the agency did and not be misled. That's all I'm getting at. Yes, Your Honor. And this court has, you know, on several occasions reviewed models. And the question is, is the model supported by the record evidence? Are the assumptions EPA is making supported by reality? I understand that, and you disagree with where they come out. But don't mislead us as to how they got there. That's all I'm getting at. We don't need to belabor this. Yes, Your Honor. And perhaps just to clarify, the reason that the iris value is so off is the selection of the model. So choosing the 1600 knotted spline, that's what drives a lot of the problem with the end result in the iris value. So it was when you're looking at all models, which one do we use? That question was a significant error, selecting a model that isn't supported by a biology or statistics. When they tried to support it with visual fit, our first point is visual fit is not an appropriate way to select a model, period. But if you are going to use visual fit, this particular graph is not one you can use for those two reasons. First, they're trying to fit it to just another model. They're not actually trying to fit it to data. And the figure itself says, don't use me to try to determine which is closer to another, because this is relative risk. This is not the actual risk from the data set. I'll give you some minutes to replug. Ms. Chen? Good morning, and may it please the court, Sue Chen for the United States. The court should uphold EPA's use of its cancer risk estimate for ethylene oxide because that my arguments, I'd like to just take a moment to clarify some of the confusion I heard this morning about different parts of EPA's quantification of risk. And just bear in mind, I'm going to throw out a lot of nuances and maybe even oversimplify for the sake of clarity here. So once EPA has concluded based on the weight of the evidence that ethylene oxide is a carcinogen, the next task was to quantify that risk. And for that, it used the biggest and most comprehensive human study it had available, and the Science Advisory Board agreed with the choice of that data set. So step one is that EPA took all the 17,000 plus individual data points and used them to create different dose response models. And those are the models you see at JA2400. It is true that earlier on, EPA had tried to create a dose response model using the categorical data, and that is shown at JA2401. But the Science Advisory Board said, no, that's not really a good idea. And so EPA went back to the drawing board and looked at the models created with individual data points. So step one was developing different dose response models. Step two is choosing one of And this is a step where issues like model fit, categorical breakouts, shape of the dose response relationship come into play. Step three is extrapolation, which petitioners reference in their reply brief. And at this step, EPA takes its dose response model and uses it to calculate a value called the point of departure, which then basically became an input into the extrapolation calculation. And you can see those calculations at JA2692. And petitioners here don't dispute the methodology for extrapolation. They're really disputing one of the inputs into the extrapolation calculation. Step four, EPA takes the risk calculated from step three and does more statistical analysis and comes up with the risk estimate that we're talking about here. So that at the 50,000 foot level is the different steps EPA took in quantifying risk. Now, I want to start by addressing the choice of the dose response model and a few things here. The kind of default linear model that petitioners are talking about, that applies to the extrapolation. So that's at step three. And you can see this discussed in hand service guidelines at JA212930 and 2224. That is where the extrapolation step. When it comes to finding the dose response model for the observed data, which is what we're talking about at step two, and which is what petitioners are really trying to get at, there is no default linear anything. The guidelines say that a linear model is appropriate unless the fit is poor. But here, and I'm sorry, let me just give you the site for that. This is at JA21212. Nowhere in the guidelines does it say that for step two, there is a linear model as a default. So I just want to sort of clear the air on that issue. On petitioners claim that all EPA did is sort of eyeball five dots to come up with the model. I think that portrays a fundamental misunderstanding of statistical analysis, because how do global breakouts are the common form in statistical analysis to make sense of a big data set? Because all you're seeing there is really just a cloud of points. And categorical breakouts allow you to see where the weight of those individual data points fall within an interval and also across different intervals. And that's important because there can be a lot of variation between individuals in how they interested in the average person's response. It's not making decisions based on the atypical response. And the average response is what the categorical breakout allows you to see. Is that breakout drawn from the underlying, the same 17,000 data points? Yes, it is. So if you look at JA2680, table D54, it shows you the interval breakouts. And there are about three to four thousand data points within each interval. I also want to push back against petitioners assertion that somehow the only respectable way to do statistics is to look at numbers and equations. That's just not right. Graphs and other visuals are a critical tool in statistical analysis. I mean, you flip open any statistics textbook and there are graphs all over the place because that kind of visual analysis shows you things that you can't see from just numbers and equations. On the, whether the models are comparable to each other in terms of relative risk, in figure 4-3, the y-axis tells you that it measures relative risk. And so if you look at different models, you can see that at a given exposure, one model might tell you that the risk you face is one and a half times relative to your baseline risk, while another model might tell you it's two and a half times. So model 2 predicts higher relative risk than model 1 does. And you can absolutely compare the models in terms of relative risk. What they don't tell you is the baseline risk that you face. That depends on who we're talking about in a given analysis. On biological plausibility, I think there's ample support in the record that EPA's analysis is supported by biological realities. First of all, the analysis underwent two rounds of external peer review by experts in statistics and epidemiology and toxicology and experts who are well-versed in the relevant literature. And they agreed with EPA's choice of the data set. And they also expressed their preference for the use of a spline model as its dose response model. And this is at JA3320-27. EPA also subjected its analysis to extensive public comments, during which commenters submit a lot of studies, including studies that post-date the cancer risk estimate. Can I stop you on this biological plausibility point? Petitioners say that generally a spline-like model is not, that EPA's own other statements say a spline-like dose response model is not common for this type of carcinogen. What's the response to that? Well, first of all, they have offered no citations to any authority for that statement, which is a big problem. The other response is, you know, it is true that for mutagenic substances, an increase in exposure means an increase in risk. And that is reflected even in a spline model. When you increase the exposure, the risk increases. Now, there are other factors at play that affect our risk. Some of that might not be completely understood, but we're seeing it in the data. I can give you a couple of theories of why we're seeing this plateauing effect. One is, you know, people who are just more susceptible to a chemical have already gotten sick or died at lower exposures. So the people who stayed on long enough to have these very high cumulative exposures could just be naturally less susceptible to the chemical in the first place. Another theory is that our bodies activate certain defense mechanisms only at high exposures. So, you know, we don't know exactly why, but that is what we're seeing in the data for not only ethylene oxide, but other occupational carcinogens. The other question I just wanted to go back to was to, I want to make sure I'm understanding the dispute over whether this is linear and whether that matters. Because in the reconsideration at 4.345 to 4.6, this is where EPA is explaining why it's not going to use the Texas model. And it says the two-piece linear spline model is a low-dose linear model as defined by the guidelines. And that's why I was asking them questions about the fact that it seems like EPA is saying this is a linear model that aligns with our guidelines. But what you said made me ballpark. The low-dose linear, first of all, the low-dose linear is defined as something with a positive slope, which if you look at EPA's model, it has a positive slope. And that the low-dose linear discussion applies to extrapolation. So step three, what we're talking about here with choice of the dose response model is step two. So we are really in a different ballpark when it comes to what the guideline is saying about low-dose linear. Okay. Unless there are other questions about the dose response model, I'd like to move to some of the studies that petitioners. So could I just ask counsel, all of that is relevant then at step two? All of what you were just talking about with Judge Garcia, your low-dose linear. No, the low-dose linear as discussed in the guidelines is talking about that as a default for the extrapolation, which is step three. My point is simply that at step two, there is no default linear or anything. Thank you. I just want to say a couple of things about the pre-1978 exposure and the smoking studies. On the exposure, the Bogan studies looking at work practices, if you look at the record at JA4818, which is the Bogan studies, it's talking about increased wash cycle since the 1980s, which is after the period we're talking about. So I don't see how that's even relevant here. On the smoker studies, I mean, the problem with the smoker studies is really that absence of evidence is not the same as evidence of absence. All we have in the smoker studies is really the absence of evidence because they didn't reliably measure ethane oxide exposure and they didn't quantify the cancer risk. So they don't say anything one way or the other about ethane oxide's cancer risk, which is what EPA is interested in hearing. But I take part of the point to be that the effects of smoking are one of the most studied impacts there is. And if EPA were right about the effect of ethylene oxide, we'd at least at a general level expect to see higher cancer rates of this type of cancer in that population if ethylene oxide is causing cancer. Well, we still have an absence of evidence because those studies are pretty vague and noncommittal about lymphoid cancer deaths in smokers. I mean, it seems like they're saying there are not enough lymphoid cancer deaths out there in smokers. Well, how many are there and how does that compare with non-smokers? We have no idea. There's an absence of information because the studies didn't look at this particular question. I'm happy to address any more questions on the merits. Otherwise, I can turn to the procedural issues. Go ahead. Okay. Just a few things on procedural issues. You know, our brief shows that EPA's use and calculation of the cancer risk estimate is procedurally sound. And I want to just spend a couple of minutes on some new arguments in the reply about specific National Academy recommendations, which go to things like greater clarity in explaining methods, better tables to use in comparing different studies and recommendations to create some general protocol and guidance. And although we think the National Academy's recommendations don't even apply here, even if they did, they don't set the standard for review. Those recommendations are aspirational goals that are aiming for something higher than just not arbitrary. And so, fair to some aspirational goals does not translate into arbitrary action as a legal matter. For that, you need to look at what happened here. And what happened here is that EPA reviewed the comments that were submitted. And yes, it disagreed with some of Petitioner's comments on the merits, but that's not a reason to find procedural defect. So, do you agree if the NAS had said something like, it's not specific to ethylene oxide, but there are such fundamental problems with this iris system that EPA needs to stop until it makes X, Y, Z changes? I think that might change the calculus, but the reality is, as EPA explained in its response to comments at JA 1884, the National Academies recognized a lot of improvements that EPA had made, but also that a lot of its recommendations are for the long term, and that there was no need for EPA to just stop all its risk assessments in the meanwhile. I think it even says affirmatively it shouldn't delay EPA's risk assessments. Right. So, the National Academies, the way these recommendations are forced, they don't really say anything about whether what EPA did was arbitrary or capricious. I'm happy to answer any other questions you may have. One last follow-up. You were starting to talk about biological explanations for a plateauing effect. I wondered if you had JA citations for those points. I'm understanding that. Thank you very much. I'm going to take a minute. Your Honor, Judge Garcia, one of your questions was for the cite-in-the-record to the biological mechanism, and that's at JA 2476. That's in the IRIS assessment. With respect to the NAS recommendation, we've heard some discussion about the long-term recommendations. There are a number of recommendations in there that would have addressed this issue, including the requirement that EPA better consider biology, better elucidate the selection of studies, better rely on statistics. The fact that they may be long-term and not addressed in every IRIS value is not a reason not to comply with 7607D3, which required EPA to identify and consider those recommendations. They don't have to comply with all of them before proceeding with rulemaking, but they have to show that they have considered them and their relevance to the rulemaking before they proceed. That's the violation we've identified here. We did not hear any response on the preference for IRIS. The fact is that that poisoned the entire rulemaking. If EPA was not going to consider everything on the way to the evidence, like they told Congress they would do, and what Congress incorporated through the Benzie-Nishap, they have not conducted a rulemaking as they were required to do by law. We heard a reference that we do not dispute the method of extrapolation. We absolutely do. That is their model selection. There is no data that the concentration EPA is attempting to regulate. All of this is an exercise in extrapolation. The way they're extrapolating is by trying to rely on a model that does not have a statistical basis. They've described the graphs as a physical tool or as a critical tool, but they cite nothing for that. There is no guidance that says visual fit should be a primary basis for selecting a model. The most that's in their guidance is that it can be a confirmatory basis of a model driven by biology and statistics. We continue to have a dispute over the y-axis. Most of their brief and an argument that you can compare them to see how close they are. The footnote speaks for itself, however. It says that the graphs are not strictly comparable across the y-axis. That's because what they're showing here is rates of increase, not absolute increases. We've heard today that they emphasize that this selection has undergone peer review. It's worth clarifying that this model selection did not go through peer review. This model selection was done after the last peer review by the SAB. In addition, on the issue of smokers, we heard that there is perhaps not enough smokers to There are more than enough smokers in the country to identify if there was, if the iris value were correct, that there would be a link to lymphoid cancer. Your honors, because EPA did not follow its own guidance, disregarded the National Academy of Sciences recommendations, replaced the required statistical and biological analysis with eyeballing chart. This was not a rational basis for rules with major real-world ramifications, particularly since the results failed multiple reality checks. We request that the rule be vacated. The case remanded to EPA for a new risk assessment. I believe Judge Garcia wanted a cite. Thank you. Thank you.
judges: Henderson, Garcia, Rogers